## CATHERINE BISHOP, Appellant, v. BRITTAIN INVESTMENT COMPANY.

**Division One, July 2, 1910.**

1. **DOWER: Marriage.** There can be no dower unless there was a marriage.

2. **TESTIMONY: One Party Dead: Character of Action.** Where the claim of either party depends on the establishment of a contract the other party to which is dead, the form of the action in which the rule against the surviving party's competency to testify is invoked, is of no consequence in determining whether the rule is applicable.

3. **DOWER: Common Law Marriage: Competency of Wife to Testify.** Dower hinges on a contract of marriage; and where plaintiff suing for dower in the estate of a deceased man, bases her right on a common law marriage, she is not competent as a witness to testify that the contract of marriage was entered into, nor can the contract be shown to exist by her testimony. The other party to the contract being dead, she is barred from testifying by Sec. 4652, R. S. 1899.

4. ———: ———: **Cohabitation.** Marriages good at common law are valid under the Missouri statute. But cohabitation alone does not establish the marriage status. The law requires that the man and woman live together as husband and wife, and cohabit as such.

5. ———: ———: ———: **Instructions.** Where the proof of the marriage contract rests in admissions by the deceased man to a few others, fortified by faint proof of repute and of the assumption of the marriage relation of man and wife, the instructions, in a suit to admeasure dower, should tell the jury that plaintiff cannot recover unless, following the alleged contract of marriage, she and the deceased man lived and cohabited together as man and wife.

6. ———: ———: **Repute.** The law requires something more than mere circumscribed and spasmodic repute to establish a common law marriage. The repute must be general in the neighborhood where the man and woman resided, or among their acquaintances, and have about it elements of a continued permanent marriage status.

7. ———: ———: **Recognition.** A recognition by the deceased man of the woman as his wife after the alleged common law marriage contract was entered into, to be sufficient in law, must be general, public and continued, and not merely furtive, spasmodic and incidental.

8. ———: ———: **Presumptions of Morality, etc.** Cohabitation and reputation are at best only presumptive proofs of a valid marriage, and when one of these foundations is withdrawn what remains is too weak to build a presumption upon. So that where plaintiff, who was the housekeeper of the owner of real estate, assumed in his household the name of a widow, thereby living an admitted lie, and after an alleged secret marriage, witnessed by no one, continued to be called by him and his children by that name, and allowed her putative husband to convey real estate as a single man, without protest, and two years after the pretended marriage took a chattel mortgage from him in her maiden name, and was not called by his name among the neighbors or their acquaintances, except occasionally and incidentally, and except that accounts with grocery merchants were made by her as his wife which he paid, and was a woman of mature years and of self-assertive intellectuality, and years after his death attempts to assert dower in valuable real estate that had passed to an innocent purchaser one year after the pretended marriage and which he conveyed as a single man, one of the foundations of a presumption of marriage is lacking, namely, reputation, and an instruction announcing in

generalities that "the presumption of marriage from cohabitation and residing together as husband and wife is one of the strongest presumptions known to the law; the law presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy," was properly refused, for the facts do not warrant the presumption.

9. ——: ——: **Evidence: Deeds.** Deeds executed by the deceased man as a single man, executed between the time of the alleged marriage and the time four years later when a "party" was given at his house at which there is evidence that he acknowledged plaintiff to be his wife, even if executed after the date he as a single man conveyed the land in which she sues for dower, are competent evidence tending to show he was not married—that there was no public recognition by him of the marriage status.

10. ——: ——: ——: **Belief of Deceased.** It is not competent to show that the deceased man believed in common law marriages. The contract of marriage does not depend upon belief, and it cannot be established by the belief of either party.

11. ——: **Remarks of Counsel: Theory Gathered from Other Suits.** Remarks of counsel in his argument to the jury that his theory of the case was based on his experience in this and another suit, in which plaintiff's right to dower was litigated, as was being done in this, were fair matters of comment—the record showing that the court did not permit him to refer to the former trial except in so far as the evidence in this case showed the proceedings in the former case were pertinent to this.

12. ——: ——: **Verdict in Former Case.** It was improper for counsel for defendant in his argument to the jury in a suit by a woman to establish dower in land, to state that the jury in another trial in which the same issue was involved had returned a verdict for defendant. But the Supreme Court does not believe that error materially affected the merits of the action, and therefore holds it was not reversible—the case not being a close one on the facts, and the jury having been informed by the evidence that the verdict in the former case had been set aside by stipulation.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman,* Judge.

AFFIRMED.

*Jas. W. Boyd, K. B. Randolph* and *P. A. Brubaker* for appellant.

(1)  The court committed error in refusing to give instructions asked by appellant.  Each of said instructions contains a correct statement of the law involved and necessary to a proper decision of this case.   (2) The court erroneously refused to give any instruction asked by the appellant correctly defining the law relating to what is usually called a common law marriage, or a marriage by mutual agreement and contract; and held and instructed the jury that there could be no marriage in Missouri known as a common law marriage, or a marriage between a man and woman by mutual contract and agreement to be husband and wife, unless such agreement, after being mutually entered into, was followed by cohabitation.   Every instruction asked by appellant which the court gave was erroneously modified by the court and given on its own motion, so as to make cohabitation necessary to marriage by mutual agreement or contract; or, in other words, to marriage not solemnized by a minister, or a priest, or an officer.  The view of the law as taken by the trial court is erroneous in this respect.  Davis v. Stouffer, 132 Mo. App. 555; Coy v. Humphreys, 123 S. W. 877; Imboden v. Trust Co., 111 Mo. App. 220; Collard v. Burch, 138 Mo. App. 94; Plattner v. Plattner, 116 Mo. App. 405; Topper v. Perry, 197 Mo. 531; State v. Kennedy, 207 Mo. 528; Dyer v. Brannock, 66 Mo. 353; State v. Hansbrough, 181 Mo. 353; Adair v. Mette, 156 Mo. 512.  It is a peculiar doctrine that cohabitation, following marriage, is necessary to the existence of a contract antecedently made and entered into.  (3) No verdict obtained under such circumstances, and by such arguments of counsel, should be sustained.  Franklin v. Railroad, 188 Mo. 545; Eppstein v. Railroad, 197 Mo. 738; Lavelles v. Railroad, 196 Mo. 623; Rice v. Sally, 176 Mo. 148; Leu v. Railroad, 106 Mo. App. 329; Hayes v. Trenton, 108 Mo. 133; Beck v. Railroad, 129

Mo. App. 23; Messignale v. Rice, 94 Mo. App. 434; Evans v. Trenton, 112 Mo. 390; Wear Bros. v. Schmelzer, 92 Mo. App. 313; Neff v. Cameron, 213 Mo. 350. The misconduct of counsel for the respondent in this case must have been more injurious to the rights of the appellant than was the conduct of the attorneys in any one of the cases hereinabove cited. Hardly anything could be more prejudicial to the appellant's rights than the statements made by the attorneys for the respondent to the jury. By these statements they obtained a verdict, through the erroneous instructions of the court and the exclusion of proper testimony. The plaintiff offered to prove by Dr. Geiger, who had known Dr. Bishop for many years, and who studied medicine and surgery in his office, that Bishop was peculiar and eccentric in many respects, and that he did not believe in marriage by minister, priest or officer of the law; that his idea was that if persons desired to marry, they should enter into a mutual contract for that purpose, without calling a minister, priest or officer to perform any ceremony. Appellant also offered to prove by Dr. Geiger or Mrs. Spratt that when Dr. Bishop was married the first time, he refused to be married by minister, priest or officer, preferring to enter upon the marriage relationship by mutual agreement between himself and the lady he married.

*Richard L. Spencer* and *Vinton Pike* for respondent.

(1) It is not the law of this State that a common law marriage may consist of words *in praesenti* and nothing more. The present agreement must be followed by a present assumption of that marriage state. Topper v. Perry, 197 Mo. 531; Sorensen v. Sorensen, 56 Neb. 729; Same issue, another case, 100 N. W. 930; Lorimer v. Lorimer, 83 N. W. 609; Brown v. Brown, 142 Ill. 409. (2) What was said by counsel of defendant in argument was within the record and within their

right. The trial court did not consider the appellant had been prejudiced, and his opinion of the matter, in the circumstances of this case, should decide any doubt. (3) No error was committed in exclusion of evidence. The offer that Dr. Bishop was peculiar and eccentric and did not believe in formal marriages was too remote and unsubstantial to amount to evidence. Besides, another witness testified to the same facts and they were not contradicted. The evidence was therefore merely cumulative. (4) The evidence of statements of Dr. Bishop that he was unmarried was properly admitted. Topper v. Perry, 197 Mo. 531. (5) It was immaterial whether plaintiff was the wife of Bishop after July 31, 1894. There is no evidence that a marriage relation existed between them prior to August 1, 1894. The plaintiff was not a competent witness to prove the marriage. Shorten v. Judd, 56 Kas. 47; Dennison v. Dennison, 35 Md. 361; Sorensen v. Sorensen, 56 Neb. 729; Lins v. Lenhardt, 127 Mo. 271; Imboden v. Trust Co., 111 Mo. App. 220; Lyon v. Lyon, 101 Mo. App. 495; Curd v. Brown, 148 Mo. 95. Even with plaintiff's testimony in, the evidence of a marriage before July 31, 1894, is insufficient. Henry v. McNeely, 24 Colo. 456; Hermann v. Hermann, 98 N. Y. Supp. 654; Laurence v. Laurence, 164 Ill. 378; Lorimer v. Lorimer, 83 N. W. (Mich.) 609.

LAMM, P. J.—Plaintiff, claiming to be the widow of Doctor Galen E. Bishop and that she was deforced of her dower in certain real estate, situate in St. Joseph, of which he was seized of an estate of inheritance during marriage, sued to admeasure dower. The answer raised the general issue.

Presently the trial came on before a jury in Judge Mosman's division of the Buchanan Circuit Court; the verdict was against her on the issue of marriage. From a judgment following, she comes up.

Plaintiff relies on (1) direct proof of a contract of marriage, (2) on admissions, (3) on repute and cohabitation as man and wife, pointing to such contract and a resulting status in that behalf. An understanding and disposition of such contentions seek a summary of the facts, *viz.*:

Bishop died in July, 1902. Plaintiff claims a common law marriage to him on January 1, 1894. Some months later, to-wit, on July 31, 1894, he executed a deed of trust to secure to one Wheeler, as curator, a loan then made on the property in question. There are record signs the value of the property is considerable, say, $50,000. He executed the deed of trust as a single man. On foreclosure, his title passed to defendant company. At the time of suit, the company was in possession. We get the idea that Bishop, at one time a rich man, was finally crippled financially. At the time in hand, he was well past middle age. He had long been a physician in St. Joseph, and, as an aid to fortune, made and vended a mixture called "Granger" as a medicine. He was married many years before, but his wife died in December, 1892. Plaintiff's name was Kate T. Cochran. Her father's first name was Chandler, it is suggested by counsel. At the time of (and for a year before) the alleged marriage she was "housekeeper" for Bishop under the name of "*Mrs. Chandler.*" She assumed this name at the outset, on becoming his housekeeper, intending thereby to pass as a married woman or widow. Bishop had been an "old beau" of hers, and the name "Chandler" was assumed at his suggestion. Her explanation runs as follows: "Well, the doctor said that I would be annoyed with gossip; the doctor was an old beau of mine and he said, 'Now if you take charge of the family' . . . he sent word for me to come up and see him; he says, 'Now if you go there by the name of Miss Kate Cochran, as you always go, they will commence telling all

229 Sup—45

kinds of stories and annoy you to death by gossip;' he says, 'can't you take another name, and call yourself by another name, and so they won't know anything, and the neighbors won't say anything?' " Accordingly, as she "admired" her father's name of Chandler, she accommodatingly took that. She and Bishop kept up a correspondence during the life of the first wife. Plaintiff was of mature years (over fifty, we infer) though younger than Bishop. She had lived in the region of St. Joseph—had been a clerk, teacher and dressmaker, had worked for Bishop off and on for nine or ten years labelling medicine bottles when his business was brisk. There is testimony (which she denies) giving an unfavorable turn to the relations between them, *viz.*, of visits to his private apartments heavily veiled and of apparent free access to them. The lady said their relations were "Platonic"—witness: "Q. What were your relations with Doctor Bishop before this alleged marriage? A. They were pure and proper. Q. You never had any intercourse with him whatever before that time? A. No, sir. Our friendship was Platonic; Doctor Bishop was an intellectual man and he liked what he said was an intellectual woman, and our friendship was always pure."

Bishop had two children by his first marriage— a boy and a girl. At the time of the death of their mother the girl, Anna, was thirteen, the boy the younger of the two. The doctor kept house. Two or three months after his wife's death he wrote plaintiff to come as his housekeeper, because the one he had was stealing. She came and was installed in that capacity.

On taking the stand in her own behalf, her competency was challenged. The court overruled the objection and counsel saved the point.

Her testimony is to the effect following: It had been arranged that her niece, Mrs. Spratt, should witness the marriage; but the doctor had "patients at the office," expressed himself as "sorry" for the

niece's absence, saying, ''I can't wait for her.'' From time to time he had suggested plaintiff be his ''common law wife.'' But the lady, doubting the honor, had steadily declined. Finally, on New Year's day, 1894, he renewed his suit argumentatively, and she, erstwhile refusing to consent, now consented at ten a. m., a spell before the niece arrived. Her story of the argumentative wooing, the coy delay, the final consent and primeval nuptials runs this way (*Scene*: The Kitchen): ''And he said, 'You know we are just as capable of keeping a contract between us;' and at the time it came all over me, and he said, 'What objection I had to him?' and I said, 'You have a son and a young girl,' and I said, 'We will have trouble over this sort of a marriage as his wife.' and he said,'Oh, no;' and he said, 'There is nothing to bar a man and a woman to be married in this way, and they were the happiest,' and he says, 'They were married, and no objection to it,' and he says, 'We will all get along, these children and all together,' and he talked on and he took my hand, and he talked earnestly, and, 'you will be my wife if you will carry this out,' and I had wanted Brother Dockery to perform the ceremony; and he seemed so anxious and crestfallen and I says, 'I will be your wife from that time on;' and he says, 'Don't tell the children; I don't want the children to know that their papa has a wife;' and he spoke about company and society, and he says, 'I don't want you to go in society;' he had never liked society before we were married, and he says that 'we would not do so to please others,' and then after a while I said, 'Let us have a witness,' and he says, 'Yes,' and we had my niece to come up, Mrs. Spratt.'' The doctor then went to his office, came back about four or five o'clock, dinner was ready. ''We had a good dinner,'' said the witness, ''We had everything nice.'' Before that he gave her a ring and, saying he wanted her to wear it ''to seal our marriage with,'' had put it on her finger. In the

meantime, too late for the marriage but in time for the wedding dinner, Mrs. Spratt came. If it did not smack of a ludicrous comment (a thing rarely, if ever, allowable in a judicial opinion) we would call her the *late* Mrs. Spratt. She noticed the ring. Whereat the doctor told her "we had been married by a contract." The ring had his initials, "G. E. B." and was produced at the trial. From that on, she says, she "sustained the relation of wife as much as any person could possibly be." She lived as one of the family as theretofore. The marriage was kept from the children and, at one place in her testimony, she said Bishop did not tell his daughter, Anna, until about 1898. Her counsel pressed to know if the daughter did not know of it before 1898. She answered: "It wasn't *distinctly* told her; she was very hard to manage." Plaintiff opened accounts in various stores, naming them, at which she gave in her name as "Mrs. Bishop" and the bills were charged to, and paid by Bishop. With the Bishop children she continued to go by the name of Chandler. In explanation she said it was to keep them from knowing of the marriage. The first Mrs. Bishop, she said, was not "married" to the doctor until 1887 when it was "legalized." Thereby inferring it was also a common law affair. The witness's idea of legalizing a marriage was not by ceremony of justice or minister but by "signing a deed with her husband." That's the way the first wife's marriage was legalized. Their joint signatures to a deed made it "legal," as she understood it. Plaintiff signed no deeds with Bishop although she knew of his making several of them after their marriage. She further explained that her use of the name "Mrs. Chandler," when she came as house keeper, was to make the children believe she was a married woman then so they would "behave," and she continued to keep that name "for five years; over five years before people." In 1898 she dropped the name, Mrs. Chandler, entirely. The people that work-

ed for her during those five years knew her by the name
of Mrs. Chandler. Though, she hazarded the suggestion
that the servants called her "Mrs. Bishop behind her
back." Those that came to the house knew her by the
name of Mrs. Chandler prior to 1898.' She "let it go
that way" because she couldn't change her name and
explain it to anybody without telling about the mar-
riage, but after 1898 the people that came there knew
her as Mrs. Bishop. From 1894, certain of her rela-
tives who visited her knew her as Mrs. Bishop and
the merchants knew her as Mrs. Bishop. For five
years, the children did not call her "mamma." The
doctor had a room downstairs. At first, the boy slept
with plaintiff and the girl slept with her father. Fi-
nally this arrangement was changed and the girl slept
with plaintiff, the boy with his father. Up to 1898 the
doctor and plaintiff did not occupy the same room
except once in a while when he was sick when she took
a cot and went in—in fact, they never occupied the
same room as "man and wife." The children did not
believe they were married and objected to their occupy-
ing the same room. In 1898 she told the daughter,
Anna, about her relations with her father. Before
that, in October, 1894, Anna had been frightened by a
thunderstorm and, running downstairs to her father's
room, had caught him and plaintiff in a compromising
situation. The next morning the doctor explained to
his daughter that "she must not interfere with me,
that I was his wife." The daughter then came in the
dining room and plaintiff said to her "I am the doctor's
wife." After that the girl "didn't pay any further
attention to it." She continued, however, to call plain-
tiff "Mrs. Chandler" until 1899 and plaintiff continued
to keep the marriage to her father a secret under an
arrangement then made (in 1894). The doctor wanted
it kept secret because he didn't want to have talk and
didn't like company. Plaintiff acquiesced in the doc-
tor's wish and kept the secret, but she "wanted some

people to know." She carried on the house after marriage as she did before. Finally there was a *denoument*. In 1898 or 1899 there was a party at Doctor Bishop's house and it was published in the papers of St. Joseph that "Doctor and Mrs. Bishop" had given a party. That was the first time any publicity had been given to the marriage except by electrical illumination at the thunderstorm, and as otherwise indicated by her foregoing testimony.

At the trial of another case between plaintiff and Bishop's children, one of the issues was the existence of a marriage. Plaintiff, in testifying in that case, was asked about this newspaper notice and whether the daughter had not read this public announcement and asked for an explanation. At that time she testified she had never mentioned the marriage to the girl before; that she did not talk about it to her and "knew it was none of her business;" that on the heels of that newspaper notice, on the daughter's demanding an explanation, she had told about the common law marriage and that she had kept it from the children at the request of their father. After the thunderstorm in October, 1894, the discovery made by the daughter and the explanations the next morning to her, the daughter brought her friends to the house and always introduced plaintiff as Mrs. Chandler until in 1898 when the second explanation was provoked by the newspaper publication. The publication sprang from the fact that plaintiff told the doctor she could not wait any more, "could not go on in this way any longer," so she determined to have a "party" and get her name in the newspaper as "Mrs. Bishop." Accordingly, a newspaper reporter came to the house and was told that Mrs. Bishop would have a party. Pressed further, plaintiff testified that in October, 1894, the daughter knew of the marriage from plaintiff's lips. She also knew it from her father, for plaintiff overheard him telling her. Recurring again to her suit with the chil-

dren, she was asked if she had not testified at that trial that the daughter was very angry, when the matter was explained to her about the marriage, over its having been kept from her for six years, and if plaintiff had not testified that she had explained to her that her father would not let her tell, and if the girl had not replied that she was more angry to find out that her father would not take her into the secret then to find out she had a stepmother. Plaintiff admitted she had so testified in substance.

In 1896 plaintiff took a chattel mortgage from Dr. Bishop, made to "Catherine Cochran." She did not see the paper before it was executed, but it was to be recorded in the court house and she went there in a week or ten days and got it. It appears the chattel mortgage covered all his books, at least, and that she got them. [Note: It does not appear what other chattels were covered by the mortgage. Objections were made to the witness testifying to its contents. It was presently brought in by her, introduced by defendant and bore date April 29, 1896. Galen E. Bishop was mortgagor and Catherine Cochran, plaintiff in this case, was mortgagee. It secured a note of $7000.]

Resuming her testimony she said she destroyed or lost her letters between 1894 and 1898. A great many of them were destroyed—to keep the children from knowing. After 1899 witness preserved some of her letters. Plaintiff was to receive $20 per month for work when she kept house for the doctor. In 1903 and 1904 she received letters from the doctor's son (now dead) addressed to "Mrs. Galen E. Bishop."

The niece who was to be a witness, Mrs. Spratt, testified that she was at Bishop's home on the day of the putative marriage, was invited to come (by whom is dark) "to witness an agreement between Doctor Bishop and Mrs. Bishop." As she came he was leaving. He told her "that they had made their agreement, that arrangement, before I got there." We infer

from the context that this was told her at the four
o'clock dinner and that Bishop then said she "was to
come to witness it." Mrs. Bishop seems to have spoken
to the effect that "she had lived there and it was the
understanding that they were to be married." Doctor
Bishop then said "they were married and had an
agreement," continuing: "Of course, you know that
she has agreed to be my wife," that she had agreed
to be his wife from that day on and the ring on her
finger was to be the evidence of that fact—
the ring was on the third finger of the left
hand. They then had a dinner "not an or-
dinary dinner, but an extra dinner—turkey and
things"—between four and five o'clock. Bishop ob-
jected to the marriage being spoken of on account of
his children. It would "make it bad for my children"
—"a great deal of contention in the family." The
witness knew him all her life. She knew him "as a
friend, acquaintance and physician."

Evidence was tendered to the effect that she knew
he was hostile to "formal marriages by preacher or
priest" and "that he considered the only form of
marriage was a common law marriage . . . and
that he lived up to that." This testimony was ex-
cluded and counsel for plaintiff saved the point. [Note:
Testimony was tendered from other witnesses tending
to show that the "belief" and "principles" of Doctor
Bishop were opposed to the solemnization of marriages
by the church or magistrates; that he believed in com-
mon law marriages. These offers were refused and
counsel excepted.]

Resuming her testimony, the remainder of it was
to the effect that, from the day of the turkey dinner,
plaintiff had charge of the household "like any other
woman." She "had charge of the house entirely."
"Doctor Bishop called her Mrs. Chandler for a short
time after that; not more than a week."

Mrs. Thomas, another niece, testified that in December, 1893, she got "notice by a letter to come to the city." (She lived five miles south.) It was "a joint letter." Its substance was that they would like to have her come "to be a witness to an important event." She went about the middle of December, 1893. She met Bishop in his office and he told her "the nature of this affair, and he explained—and went on to say about the marriage between him and my aunt." Witness did not know whether it was "to be a common law or what kind." He told her it had been postponed for a short time on account of her aunt's accident. About the middle of January, 1894, witness was again in Bishop's office. He then said "that he and my aunt were married, but he didn't say still whether it was something of that kind." Witness did not pay much attention, didn't ask anything; "he said they were married." Witness spoke of going out and staying over night and he replied "he would like to have me come out and be very careful about talking about it." He didn't want the children to know about it "at least right away anyway."

William King, acquainted with Bishop for forty-five years, had two conversations with him about 1897. One of them was when Bishop was passing the house of witness. His wife was in the garden and Bishop said: "Your wife is just like mine; she is always out in the garden working in the flowers." At another time Bishop saw witness driving a cow and asked her price. Witness declined to sell. Bishop said: "My wife has seen you passing. She (referring to the cow) just suits my wife." This was before the "party."

By Mrs. Watson, who lived at Dearborn, Missouri, and published a newspaper there, it was shown that she heard her nephew, who was also the nephew of plaintiff, speak of the subject of the marriage "in March, 1894." In October, 1899, plaintiff, with Anna Bishop, came to Dearborn and witness heard her call plaintiff

"mother." Plaintiff and Doctor Bishop were reared in that community, were known to the older people and "it was generally understood as early as March, 1894, in that community that they were married. It was common reputation that they were married."

Solomon Fayman, a merchant, knew Bishop. He and plaintiff dealt with witness to some extent. Bishop paid the bills and told witness "that Mrs. Bishop would buy some goods." This was ten or twelve years before Bishop died. Witness knew Bishop and plaintiff "as man and wife."

Mr. Moore, clerk for a dry goods house, testified plaintiff bought goods and had them charged to "Mrs. Bishop" during the last ten or twelve years. She was known at the store as Mrs. Bishop, the wife of Dr. Galen E. Bishop.

Another witness, McAhan, was at a reception at Bishop's house. He puts the date at 1895 or 1896. Something was asked there about addressing plaintiff and it was said she "should be addressed as Mrs. Bishop." Several young men and ladies, the Bishop children, Doctor Bishop and plaintiff were there. Witness was a newspaper man. It was plaintiff who said "they were married." She requested that she should be addressed "as Mrs. Bishop." At first plaintiff was known as Chandler, but after that as Mrs. Bishop.

A hardware merchant, Shatz, sold goods to Bishop. About twelve years ago plaintiff began trading there. Witness knew her as "Mrs. Bishop." The goods were charged to Bishop and paid for by him.

Neudorff sold groceries to Bishop and plaintiff. Sometimes they came and took the goods away. Sometimes they sent in orders. Witness's impression was that his name was signed by her to the order. The bills were charged to and paid by him. Witness "supposed she was Mrs. Bishop all the time."

Another grocer, Siedel, dealt with plaintiff and Doctor Bishop paid the bills. This was later than 1896.

On presenting a certain bill Bishop asked: "Who bought that bill?" Witness replied, "Mrs. Bishop." The doctor said nothing, and paid the bill.

Fulton, tenant in one of Bishop's houses, went to the doctor's house to see him about some repairs about 1901 or 1902. At that time the doctor told him he was married to a Miss Cochran. Witness asked, "how long?" The doctor, after replying, "About eight years," looked over his shoulder to plaintiff and said, "Haven't we, Mrs. Bishop?"

In 1901 an old country acquaintance of Doctor Bishop and plaintiff, one Dean, called to see him. At that time the doctor invited witness to his house to see his wife. He used the word "wife" two or three times in the conversation. Another country acquaintance, MacInturf, met the plaintiff in Doctor Bishop's office at some date between 1895 and 1900 and the doctor introduced plaintiff to him as his wife.

A credit man in a dry goods store, Shuler, testified that he knew plaintiff for ten or twelve years as Mrs. Bishop, that she would buy goods at the store and the tickets would come to the witness charged to G. E. Bishop as bought by his wife. They were put in the books that way and Bishop paid the bills.

Another witness, Davidson, from Dearborn, heard it rumored in the courtroom ten or eleven years ago that plaintiff and Bishop were married. The witness knew them both. He was shown a newspaper published at Dearborn, dated November 3, 1899, containing a notice that "Mrs. Doctor Galen E. Bishop and daughter, Miss Anna Lee, of St. Joseph, returned home Sunday night after a few days' visit with Mrs. C. A. Stagner." Witness was a subscriber to the paper and located the courtroom rumor at about the date of the Dearborn rumor.

In 1900 plaintiff introduced herself to another witness, Mr. Gard, the principal of a business school, as

Mrs. Bishop. She put the doctor's son in his school and Doctor Bishop paid the bills.

Another Dearborn witness, Miss Stagner, testified that in 1899 plaintiff and Doctor Bishop's daughter visited the witness's mother and she heard the daughter call plaintiff "mamma."

Plaintiff also put in evidence from Wey, Shoemaker and Long to the effect that plaintiff bought goods and had them charged to Doctor Bishop who paid the bills and that they knew her as Mrs. Bishop.

Mr. and Mrs. Altwein lived in the neighborhood of Doctor Bishop for three years before he died. [Note: This would be from 1899 to 1902.] The Altweins knew the children addressed plaintiff as "mamma" and that it was understood at that time in the neighborhood they were married.

In 1896 a Mr. Miller returned a strayed cow to Doctor Bishop. He wanted to buy the cow and Doctor Bishop replied: "Well, if Mrs. Bishop is willing, talk to her." Witness always "thought" that plaintiff was Mrs. Bishop.

A year or so before the doctor died another witness, Keedy, presented a bill and the doctor said: "I will take this home and see my wife."

Another witness, Dunn, who used to go to the doctor's office frequently, had seen the plaintiff in Doctor Bishop's carriage near his office. Once, on a date unknown to the witness, he heard a lady in the doctor's office ask him, "How is Mrs. Bishop?" and heard him say, "She is all right."

Such was the evidence put in by plaintiff to prove the marriage. On defendant's behalf, plaintiff's abstract shows as follows:

"The defendant introduced evidence tending to show that the plaintiff went by the name of Chandler until in 1898, when she took the name of Bishop, and other evidence tending to show that Doctor Bishop called her his housekeeper for several years after she

went there.   There was considerable evidence of this kind for the purpose of contradicting the evidence of the plaintiff.

"The defendants offered in evidence, certain deeds executed in 1896 by Doctor Bishop for the purpose of showing that in the acknowledgment he declared himself to be single and unmarried.   The plaintiff objected to them as incompetent and irrelevant, and as self-serving, and for reason that no declaration that Doctor Bishop could make after the marriage could affect the marriage in any way, or would tend to destroy the contract. The court overruled the objection, and the plaintiff then and there at the time excepted.

"A number of deeds of that kind were introduced and also a notary public was introduced for the purpose of showing the declaration made in his presence when the acknowledgment was taken.   All of this evidence was objected to as it was not shown that Mrs. Bishop was present.   The objection was overruled and the plaintiff excepted."

Defendant filed a supplemental additional abstract, bringing up more of the record.   It appears therefrom that one Story testified he had worked for Bishop off and on from the Civil War to his death.   He knew the doctor's first wife.   In speaking of her Bishop always called her "my wife."   He knew the plaintiff when she first appeared in Bishop's household as housekeeper.   He saw for himself that she took the position of housekeeper.   She was called "Mrs. Chandler."   The doctor always spoke to others of her as Mrs. Chandler. Witness never heard him speak of her as his wife.   He knew of the "party" by reading of it in the newspapers.   Next morning he was at the Bishop house and spoke to plaintiff as "Mrs. Chandler."   Plaintiff said to him: "Mr. Story, if you please, do not call me Mrs. Chandler any more; I am Doctor Bishop's wife.   I guess you understand it."   That was the first time he ever heard her claim to be his wife.   So far as

the housekeeping was concerned, there was no differ-
ence from the time she first appeared as housekeeper
until the time of the "party" (in '98 or '99).

Referring to deeds put in evidence by defendant,
the additional abstract shows that the notary public
taking Doctor Bishop's acknowledgment testified that
he at the time stated he was an unmarried man and
the notary certified to that fact in the certificates of
acknowledgment. In the deeds Doctor Bishop was
described as "an unmarried man."

Doctor Steiner was plaintiff's dentist from 1893
to 1899. He testified she introduced herself to him as
"Mrs. Chandler."

The additional abstract concludes as follows:
"Neighbors, milliners, tradesmen and other people
testified that from '94 to '99 they knew her as Mrs.
Chandler, the housekeeper for Doctor Bishop, and that
she was reputed and understood to be that and not his
wife."

As shown by the abstracts, the bill of exceptions
contains matter relating to a suit of the Bishop chil-
dren against plaintiff, in which one of the issues was
the validity of the marriage of their father. During
the trial the record in the other case was offered by
defendant as evidence on its behalf and was ruled
out. Defendant's abstract shows as follows:

"Upon discussion of said offer a great deal was
said in the presence and hearing of the jury by the
counsel on both sides respecting what said record con-
tained and its effect and meaning."

Plaintiff's abstract shows that while she was on
the stand one of defendant's counsel asked her if she
didn't take an appeal in that case. On objection the
testimony was excluded. Thereupon counsel said they
were going to offer the record in evidence. They as-
serted it was admissible, that they had authorities to
support the proposition. At that, learned counsel for

plaintiff said: *"We have the agreement by which that judgment was to be set aside."*

On argument to the jury, the record shows as follows:

"Vinton Pike, one of the attorneys for the defendant, in his speech to the jury on the behalf of the defendant told the jury a number of times that 'this case had been tried once before in the court and decided against the plaintiff.' He further in his speech to the jury said: ''That if the jury should find that a common law marriage existed on such evidence, then the estate of Isaac Curd, John Brady and other old bachelors, who were well known by their neighbors and acquaintances to be single and unmarried, would' not be safe, and deeds from them could not be taken to land with safety.' As soon as said attorney began to make such statements, one of plaintiff's attorneys objected to such line of statements, and each time he made any such statement, plaintiff stated' that such argument was not based on any law or fact of record, and that such a course was done with the intention of prejudicing the jury against plaintiff and was improper and illegal, but the court permitted him to proceed over said objections and plaintiff then and there excepted to said rulings.

"Mr. Pike continued to argue said case, making the statements as stated above in different forms and words, and each time he made such statement, the plaintiff excepted to said statements, and the court permitted and allowed said attorney to say that a similar case had been tried once before in this court, and that if the jury should establish the doctrine of a common law marriage on such evidence, the estates of many prominent citizens would not be safe and the titles to real estate therefore would and might not be valid."

During the argument the following record was also made:

"After said instructions were given to the jury, the case was argued by the attorneys on their respective sides. R. L. Spencer, one of the attorneys for the defendant, in his argument to the jury said: 'Having tried another case between this plaintiff and the children of Dr. Bishop, where the issues were the same, and also having participated in this trial, I have a theory which I will give to you based upon my experience in both cases.' Mr. Spencer then proceeded to argue that there never was an understanding of a marital relation or anything akin to it between Dr. Bishop and the plaintiff prior to the garden party given at Dr. Bishop's house in '98 or '99, when as he insisted, the plaintiff cunningly procured the doctor's consent to the publication in the newspaper of the party as given by Mrs. and Mr. Bishop. Mr. Spencer then proceeded to compare the statements of the plaintiff made on the former trial with statements made on this trial.

"The plaintiff objected to Mr. Spencer making any reference to what transpired on the former trial, and the court did not permit him to refer to the former trial, except in so far as the evidence in this case showed the proceedings in the former trial were pertinent to this trial, and permitted the attorney to address the jury on that subject, referring to what he claimed were the conflicting statements of the plaintiff on the two trials. The plaintiff excepted to this ruling of the court."

Counsel assign error in ruling on instructions, testimony and on remarks of counsel to the jury, *arguendo*. *Contra*, it is argued there was no reversible error. Not only so, but that plaintiff was not a competent witness to prove the marriage; that the court committed error in plaintiff's favor in permitting her to testify to the contract; that without her testimony she made no case for the jury, or a very weak one; that the verdict was manifestly right and therefore

the judgment should stand, even if, in the hot foot of a long trial, we should conclude trivial error crept into the record. On the other hand, counsel contend that even if we conclude she was not a competent witness, there is left substantial evidence showing her marriage to Bishop at date of the deed of trust.

On such record, we rule:

I. Somewhat by *innuendo* it is argued that the relations of Miss Cochran to Doctor Bishop during the lifetime of his first wife were meretricious. The argument travels on the theory that if such wanton and irregular status was established at that time it is presumed to continue and the burden shifts to plaintiff to show its sinister character altered. But the case need not ride off here on such narrow and sour theory. Such inferential claim of sexual looseness between them, during the lifetime of the first wife, takes form and color from suspicion rather than proof. Plaintiff said their then relations were ''Platonic.'' Assuming for appellate purposes that she not only *knew*, but that she was a competent judge (if not an actual devotee at the altar) of the rather cold doctrines of Plato, we will take her word for it, as the jury might have done —and let it go at that. For does not the benign and admonitory motto of the very Order of the Garter itself run: Evil to him who evil thinks? (*Honi soit qui mal y pense.*)

II. Was plaintiff a competent witness? The suit was in form to admeasure dower. The gist of the essential averments of the petition were: (1) marriage, (2) seisin, (3) death, (4) dower—the latter a sequence of the three former (*Vide*, R. S. 1899, sec. 2933). Such was the rule at common law and such it is in this State. I have read that Robert Toombs, appearing for a widow deforced of her dower, arose at the bar of the Supreme Court of Georgia and condensed his whole

argument into the oracular and exclamatory utterance: "Marriage! Seisin! Death! Dower!" In our case seisin of an estate of inheritance and death are admitted. Marriage is claimed some months before the deed of trust (the root of defendant's title) was executed. Marriage as of that date was disputed. It resulted that marriage or no marriage before the execution of the deed of trust was the sole issue below. A contract to marry and a performance of that contract are asserted by the lady. Her case stands or falls only as she proves or fails to prove those two vital facts. To prove the contract and performance she took up the cudgels in her own behalf by going on the stand. Obviously her testimony was material. To use the favorite expression of Lord Kenyon: "It hit the bird in the eye," provided she was competent to testify. The question is anxious and rests on statute law.

Section 4652, Revised Statutes 1899, ordains, *inter alia,* that: "In actions where one of the original parties to the contract or cause of action in issue and on trial is dead . . . the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor."

We have often construed that section. Its general language breeds difficulty in applying it to the varying phases of litigation, and, it would seem, we have not always been able to hold a steady and uniform voice in applying it. There may be wrinkles in the statute not yet erased by the smoothing iron of justice, for there is an intense human factor in its practical application appealing to different judges in a different way.

The broad objects of the statute are: first, equality; second, to close the door to false swearing. To further that end we have assumed the reason of the statutory rule to be as laid down by Dr. Wharton, *viz.*, "That when the lips of one party to a contract are closed by death, then the other party should not be heard as a witness." [Chapman v. Dougherty, 87 Mo. l. c. 621.] The purpose running through all such statutes "is to provide that when one of the parties to a litigated obligation is silenced by death, the other shall be silenced by law." [1 Whart. on Ev., sec. 466.] In applying the statute it has been ruled that where, as in ejectment, the issue was title and one of the parties to a deed necessary to establish it was dead, the living party could not testify in denial of the validity of the deed (Chapman v. Dougherty, supra); nor to sustain a contract, which, if established, would defeat ejectment (Hughes v. Israel, 73 Mo. 538); nor to establish in ejectment the contents of a lost deed (Messimer v. McCray, 113 Mo. 382); nor to establish the contract in a suit for specific performance (Teats v. Flanders, 118 Mo. 660) nor to acts of performance (Sitton v. Shipp, 65 Mo. 297); nor to reform a contract by supplying a term omitted by mistake, accident or oversight (Smith v. Smith, 201 Mo. 533).

In interpreting the statute, exceeding care should be taken to steadily apply the main and golden rule of construction, *viz.*, that not only the words but the spirit and purpose of the law should be kept in view, so that the mischief struck at should be retarded, on one hand, and the remedy contemplated should be advanced, on the other.

Observe, the statutory rule is one of *evidence,* hence the *form* of the action in which the rule is invoked is of no consequence in determining whether the rule is applicable. So, while the form of this action is dower, yet dower hinges on a contract of matrimony and its performance. As said, that was the issue tried.

Matrimony was "the contract . . . . in issue and on trial." At bottom it was the very "cause of action in issue and on trial." Therefore, the mischiefs under the ban of the statute gave birth to a situation to be narrowly eyed. That situation vehemently calls for the statutory interdiction. This, because the danger of perjury in this character of case is enhanced by a combination of powerful impulses, *viz.*, to cleanse her social status from a scarlet stain of sexual impurity, and, with the same stroke, line her pockets. Prestige! Money! The love of both—master passions of the human breast—in full cry. His legs go far and fast, who is running to a goal of gain and honor. Not only so, but, Bishop being dead, the danger of exposure in false swearing is reduced to a minimum and may invite the hazard of the experiment.

Speaking of such a contract, ALVEY, J., in Denison v. Denison, 35 Md. 1. c. 381, used language meeting our unqualified approval, *viz*: "These loose and irregular contracts, as a general thing, derive no support from morals or religion, but are most generally founded in wanton and licentious cohabitation."

The case, then, does not persuade us to stickle on words or stick in the bark in applying the statute. The rather we are inclined to consider it a typical one in which to apply the statute with rigid vigor.

Referring to an Illinois law, having the same purpose as our own, the Supreme Court of that State, through Mr. Justice SCOTT, In re Estate of Mark H. Maher, 210 Ill. 1. c. 170, said: "This petitioner seeks to swear that she is heir, and thereby establish the relation which, when not conceded, must be established by the judgment or decree of a court before she can testify. If she is competent, then any woman with whom a man has illicitly and openly lived and cohabited, both being then unmarried, has it in her power, after his death, to establish the fact that she is his widow, by testifying that a contract of marriage was

entered into by him with her when they were alone, in pursuance of which the cohabitation occurred, for none can deny her. It is precisely such an evil that the Legislature intended to prevent by the enactment of section 2 of the chapter on evidence.''

The question has received consideration by our courts of appeal. [Imboden v. Trust Co., 111 Mo. App. 220; Collard v. Burch, 138 Mo. App. 94.] Our learned brethren of both those benches with one accord agree that the statute applies to a case in which the marriage was disputed and its existence was the very *lis mota.* [See also Hopkins v. Bowers, 111 N. C. 175; Sorensen v. Sorensen, 56 Neb. 729; Shorten v. Judd, 56 Kan. 43.]

We are not confronted with a contrary ruling in any case decided by us in which the point was held in judgment. Cases may be found in which the alleged widow testified without objection. They are, of course, without authority. There are others in which the marriage was not disputed and was not the issue on trial, where the widow was permitted to testify to the fact of marriage. That is a mere rule of convenience to avoid cumbering the record on non-controverted and collateral matter. Such case, on principle, differs vastly from the case at bar.

Defendant's objection to the competency of plaintiff as a witness should have been sustained.

III. Of the instructions. Some were given. Many were refused on both sides, others modified. Before considering assigned error in this particular, some preliminary observations are not amiss. Our statute, Revised Statutes 1899, section 4311, reads: ''Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting is essential.'' The statute does not in terms abrogate the rules of the common law relating to marriage. While it provides for official licenses to marry, the

return and public record of such licenses, and while it provides in ensuing sections for the solemnization of marriages by preachers of the Gospel, by judges of courts of record and by justices of the peace, yet it nowhere provides that the absence of a license or statutory solemnization should avoid the marriage. To this situation the general rule applies that the common law is not abrogated and that marriages good at common law are valid under statutes such as ours.

While we may speak of marriage as a civil contract, yet that is a narrow view of it. The consensus of opinion in civilized nations is that marriage is something more than a dry contract. It is a contract differing from all others. For instance: Only a court can dissolve it. It may not be rescinded at will like other contracts. Only one such can exist at a time. It may not exist between near blood kin. It legitimizes children. It touches the laws of inheritance. It affects title to real estate. It provides for the perpetuity of the race. It makes a hearthstone, a home, a family. It marks the line between the morals of the barnyard and the morals of civilized men, between reasoning affection and animal lust. In fine, it rises to the dignity of a *status* in which society, morals, religion, reason and the State itself have a live and large interest. It is not necessary for us to rule that if Henry and Henrietta contract to marry with the solemnities prescribed by statute and Henry die before the consummation of the marriage, Henrietta is not his widow. Nor is it necessary to rule that if Paul and Paulina publicly take each other as man and wife and publicly agree in words of the present tense to assume that relation, and that contract is proved by its very publicity and the presence of witnesses, so that the world may know it is gravely made, it is not a valid marriage in Missouri without being further consummated. When Paul under such circumstances dies before such consummation, and such case is here, we can pass on it.

Or when a suit arises on such mockery of marriage as that John and Jane claim to marry by contract without witness, or without intending to assume the actual relation and responsibility of man and wife (and, by choice, do not assume it), and such case is presented to us, we can decide it. But we do rule that where, as in this case, the marriage, the contract, is sought to be proved by proof of the status of man and wife, *viz.*, that the woman and man cohabited as such, then cohabitation as man and wife, *i. e.*, living together *as such* is an essential element in making out plaintiff's case and the instructions should put to the jury that view of the matter.

Defining "cohabit" (Webster's New Interna'l Dict., tit. *cohabit*) we find the following: "To dwell or live together as husband and wife. In the United States at the common law, marriage is presumed when a man and woman have *cohabited* permanently together, being reputed by those who know them to be husband and wife, and admitting the relationship. . . . The act of *cohabiting* does not necessarily imply coitus." We may add that while *copula* may not be an essential element, yet it is by law presumed in cohabitation, and its absence is significant as against nature.

These general observations bring us to a point raised, *viz.*:

(a). The court modified several instructions asked by plaintiff by inserting clauses requiring the jury to find, in effect, that plaintiff and Bishop, following the alleged contract to marry, lived and cohabited together as man and wife. These amendments were objected to and error is assigned in that behalf, but as plaintiff was not a competent witness to prove the contract and as without her testimony the proof of the contract rests in admissions to Mrs. Spratt and a few others, as fortified by faint proof of repute and of the assumption of the relation of man and wife, we think

the amendments by the court were well enough. They tend to conserve the integrity of the relation of husband and wife. They make it difficult to elevate mere evil concupiscence and fornication into matrimony.

This holding is within the doctrine of well considered cases, for example:

In Lorimer v. Lorimer, 124 Mich. 631, after review of cases, MOORE, J., summed up by saying: "But at no time has it been said that, in the absence of a valid marriage ceremony, a simple agreement to live together, even though the parties intended to carry out the agreement, is sufficient to constitute a valid marriage, unless acted upon by living together and cohabiting as husband and wife." He cites· Judge COOLEY, who in Hutchins v. Kimmell, 31 Mich. 126, ruled: "Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, *and from that time lived together professedly in that relation,* proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations."

A profound law-writer, Bishop (1 Bish., Mar., Div. and Sep., sec. 380), incorporates into his text a part of Lord WESTBURY's opinion in Campbell v. Campbell, L. R. 1 H. L. Sc. 182, 211, as follows: "Cohabitation as husband and wife is a manifestation of the parties having consented to contract that relation *inter se.* It is a holding forth to the world, by the manner of daily life, by conduct, demeanor, and habit, that the man and woman who live together have agreed' to take each other in marriage, and to stand in the mutual relation of husband and wife; and, when credit is given by those among whom they live, by their relatives, neighbors, friends, and acquaintances, to these representations and this continued conduct, then habit and repute arise, and attend upon the cohabitation.

The parties are holden and reputed to be husband and wife.''

Mr. Bishop adds: ''The cohabitation must be matrimonial. The repute, to have its fullest effect, should be uniform. It then casts on the party denying the marriage the burden of proving that it did not take place. Still, in some circumstances, a preponderating repute of marriage has been accepted as adequate.''

In Topper v. Perry, 197 Mo. l. c. 546, GANTT, J., said: ''When the consent to marry is manifested by words *de presenti,* a present assumption of the marriage status is necessary.'' The language of our learned brother must, of course, be construed with reference to the case in judgment, *viz.,* a common law marriage. See, also, Cargile v. Wood, 63 Mo. l. c. 513.

The point in hand is ruled against plaintiff.

(b). The court refusing for plaintiff the following instruction, her counsel assign error:

''The court instructs the jury that if they believe from the evidence in this case that from and after January 1, 1894, the plaintiff and Dr. Galen E. Bishop, deceased, lived together as husband and wife, and that she was reputed to be his wife and that he recognized her as his wife, then the law presumes that she is his wife.

''The presumption of marriage from cohabitation and residing together as husband and wife is one of the strongest presumptions known to the law; the law presumes morality and not immorality, marriage and not concubinage, legitimacy, not bastardy.''

It will be observed the instruction is divided into two rather independent clauses; the first says that from living together as husband and wife and that she was reputed to be his wife and that he recognized her as his wife, if the jury find it to be so, then the law presumes she is his wife. The second clause deals with the general presumption of innocence in cohabitation and residing together as husband and wife.

Speaking to the first clause, if the court had given it to the jury, its terms would have been complied with by repute whether general or not, whether in the neighborhood among their acquaintances or elsewhere, whether continued and permanent or by fits and starts. Such repute does not meet the stringent requirements of the law. [Campbell v. Campbell, supra.] If the language, "he recognized her as his wife," refers to a *general* or full recognition from and after January 1, 1894, it is not sustained by the proof. Such recognition may have existed after the "party" but not before. If it refers to a recognition now and then, sporadic, furtive, incidental, and not a continued, public recognition, "a holding forth to the world by the manner of daily life, by conduct, demeanor and habit," etc., then it does not meet the high standard set in Campbell v. Campbell.

This woman, who, on a secret so-called marriage, assumed in the household, among its visitors and in the neighborhood, the name of a widow, *viz.*, Mrs. Chandler, thereby living an admitted lie, who allowed her putative husband to borrow money and convey real estate as a single man without lifting a finger in protest, who years after his death claims dower in a valuable estate that had passed to an innocent purchaser, who two years after the marriage took a chattel mortgage in her maiden name from him, whose marriage was never blessed or blazoned by rites of church, the ceremony of civil magistrate or by public record, who defiantly, though of mature years and self-asserted intellectuality, ignored public policy, the conventionalities and the law, ought not to complain if that law requires substantial proof and a high standard of it to establish marriage. The instruction would have permitted a recovery on proof falling much short of the character outlined.

As to the second clause, it leaves out the element

of *general* repute among the neighbors, friends and acquaintances arising from acts and continued conduct in holding themselves forth as husband and wife. The generalities that the law presumes morality, not immorality; marriage, not concubinage; legitimacy, not bastardy, are maxims applicable to cases where the proof of marriage is of such character as to warrant the presumption. To our minds, the facts of this case were not that way.

We said in Cargile v. Wood, 63 Mo. 513: "Cohabitation and reputation are at best only presumptive proofs, and when one of these foundations is withdrawn, what remains is too weak to build a presumption on. There is good sense in the Scotch law, by which cohabitation alone is considered insufficient, and which requires in addition habit and repute, because it is said the parties may eat, live and sleep together as mistress and keeper without any intention of entering into marriage. Cohabitation is simply the first step, and when that is accompanied by an acknowledgment of the matrimonial relations, and treating each other as man and wife, and holding one another out to the world as such, there may reasonably be a presumption founded upon all these facts that the intercourse is lawful instead of meretricious."

The instruction was properly refused. We shall not reproduce the other instructions. They were carefully drawn and gave the plaintiff all the law she was entitled to.

IV. Of error assigned on rulings on testimony.

(a). While exceptions were taken to the admission of certain deeds executed by Bishop as a single man between January 1, 1894, and the date of the publicity party in 1898 or 1899, yet we do not see that counsel assign error in that particular. But if we are mistaken, the point is not sound. The execution of such deeds were acts of the alleged husband tending to show he was not married, that there was no public recogni-

tion by him of that status.  [Imboden v. Trust Co., 111 Mo. App. 1. c. 234 *et seq.*]

(b). The main assignment is the exclusion of testimony tending to show that Doctor Bishop *believed* in common law marriages.  The offer was to get at his sentiments through his admissions to two or three friends.  The theory of this line of testimony is that if he believed in such marriages he would likely carry his belief into action, that plaintiff was entitled to the proof in order to predicate an argument on the proof to the effect that he carried out his belief.  One vital flaw in this offer consists in the fact that it takes two to make a bargain in matrimony.  If one believes and the other does not, the belief of the one does not tend to prove the contract.  If this were not so, then, as plaintiff did not believe in common law marriages under this record, her lack of belief disproves the contract by the same token, *ergo,* the evidence leaves the issue where it found it.

Appellant's counsel, excellently equipped with learning, cite us to no authority for the proposition. We know, then, it is strange and fear it is new.  As all things are confirmed or impugned by either reason or authority, let us look to its reason and see how the principle would work in practice.  Suppose the issue be an act, a fact, for instance, some sin or delinquency —drunkenness, lying, profane swearing, anger, or laziness will do.  Under this new doctrine the door would be opened wide to evidence on a collateral issue, *viz.,* that the party charged with the act, fact or delinquency did or did not believe in drinking, in lying, in swearing, in anger, in laziness as a correct ethical proposition— the argument being that, if he believed in none of them he did none of them or, *e converso,* if he believed in them, he did all of them.  There would be startling results reached by that method of reasoning; for, verily, many a man lies who down in his soul believes in truthfulness, and drinks who by precept teaches the

virtue of soberness, and has a peppery disposition who believes in calmness, and sins who thinks well of righteousness, and is lazy while lauding ant-like industry.

We are of the notion that if this court is ever to adopt the ingenious theory of learned counsel, it should be in a different case from the one at bar. The time is not ripe for rash innovations in the rules of evidence to establish irregular marriages. After all, the fact of marriage, not the belief of Bishop, was the issue. A belief is not a habit, or a characteristic. Some men change their beliefs as they change their coats. So, they talk at random on them for argument's sake. There is no presumption of law or fact that men, in their actions, always live up to the high-water mark of their beliefs on ethical questions, and, unless the offered evidence has a logical connection with the ultimate facts to be proved, it has no place in a lawsuit. If the belief of Bishop was the issue on trial, there would be a different question here. We are of opinion the testimony was improper. Hence, there was no error in excluding it.

V. Finally, error is assigned in the ruling on objections to remarks of counsel to the jury.

(a). We see no error in the ruling on Mr. Spencer's remarks. He said he had a theory. Counsel are entitled to theories. He said his theory was based on his experience in two suits. The record shows there were two suits in which the right to dower was litigated, and that the jury knew that fact. The only thing he stated as a fact, that the jury did not know, was that he was an attorney in the first case. It would not do to disturb the verdict because counsel, by way of inducement to lend color to his conclusions, spoke of his professional connection with a certain case. The record shows that "the court did not permit him to refer to the former trial, except in so far as the evi-

dence in this case showed the proceedings in the former case were pertinent to this trial, and permitted the attorney to address the jury on that subject, referring to what he claimed were the conflicting statements of the plaintiff on the two trials.'' These conflicts were in evidence and a fair matter of comment.

(b). But so much cannot be said for the remarks of Mr. Pike and the ruling of the trial court. It was beyond the bounds of legitimate argument to refer to a decision against plaintiff in a former case. There was no evidence showing a former decision against her, and the tendency of that line of argument was to persuade a favorable verdict by indirectly pointing to the path the former jury took. Do, said counsel in effect, as your neighbors under oath did in the other case. The court should not have permitted the argument. It was not the way to get an honest verdict on the facts of the case. But the question is not: Error or no error? The question is: Reversible error or nonreversible error? The statutory rule is (R. S. 1899, sec. 865): ''The Supreme Court . . . shall not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant . . . materially affecting the merits of the action.'' We must not only believe that error was committed against appellant but that it materially affects the merits. We have no such belief in this case. Because:

(1). If the case were close on the facts and there were sharp conflict on them, the question of the exclusion or admission of certain evidence is much more significant than where the facts run in a broad and deep current against appellant. [Chlanda v. Transit Co., 213 Mo. 268.] In a close case the adage applies: It was the last hair that broke the camel's back. The same principle applies on improper remarks of counsel. This is not a close case on the facts. To the contrary, they lie overwhelmingly on the side of defendant. Up

Bishop v. Brittain Inv. Co.

to the publicity party in 1898 or 1899, the status of man and wife was not recognized generally by Bishop or plaintiff. There was no general repute and habit established in that regard among the people of the vicinage. To the contrary, in the household and in the vicinage a studied attempt was made to make it appear that she was a widow and he a widower. The thin excuse for this unhappy situation was that the children (thirteen and eight, respectively) would object to marriage. Their interviews as husband and wife were stolen and revealed at the outset by a stroke of lightning, she accepting pay for her services in her maiden name in a dignified sum secured by a chattel mortgage and spread of record. But little judicial sympathy, absent children born, can be extended to such a situation, where the parties in interest have come to years of mature judgment and the fevers and thoughtlessness of youth are over and gone.

(2). But this is not all. The record shows the fact of a former case, in which she testified on the same issue, was before the jury. It shows that before the jury, and prior to the time the verdict in the former case had been announced by defendant's counsel, one of plaintiff's counsel stated that he had a stipulation setting the verdict aside. This announcement was made when a question was asked her if she hadn't appealed from the judgment in that case. Counsel should have confined themselves to an objection to that question. The question was overruled but before it was overruled announcement was made that the stipulation to set it aside existed. The situation then was this: one side, by the question relating to the appeal, intimated the judgment was adverse to her, while the other side baldly announced the judgment was inoperative because of the stipulation. The record shows that afterwards there was a discussion in the presence of the jury relating to the issues tried and the judgment rendered. This arose

on an argument *pro* and *con* on the admissibility of the record in the other case. On a record in this fix, with the jury already knowing of the adverse verdict, the remarks of counsel in his final address to the jury would not have as much weight as if the matter was then injected into the jury's mind for the first time. The thing stood somewhat in this fashion: One attorney asserting an adverse verdict in a former suit, the other, a stipulation to set it aside. We will not say that reversible error got into the case on such a showing, although we do say that counsel was betrayed and hurried by fervor and inadvertence beyond the bounds of proper argument. It was a dangerous experiment, and if the case was a close one we would reverse the judgment on account of it.

(3). The *ad hominem* argument by which the jury was pointed to certain old and rich bachelors in St. Joseph whose free right of conveying their real estate might be impinged upon by an adverse verdict against his client, was a mere oratorical conceit or flourish, a flight of jocular fancy. Instead of real names of real men counsel might have used straw men and straw names to serve his hypothetical purpose. That he did not do so gave a touch of local color to his conceit but did not inject the poison of reversible error. The bachelors named had ground of complaint, but not plaintiff.

There are other points made. We deem them immaterial. The premises considered, the judgment was right and is affirmed. All concur but *Woodson, J.*, not sitting.